**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket Nos. 45363 and 45385**

| | | |
|---|---|---|
| IN THE INTEREST OF THE DOE CHILDREN, Children under eighteen (18) years of age | ) ) ) | |
| -------------------------------------------------------- | ) | |
| IDAHO DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Boise, January 2018 Term |
| | ) | 2018 Opinion No. 21 |
| Petitioner-Respondent, | ) | |
| v. | ) ) | Filed: March 6, 2018 |
| JOHN DOE (2017-27) JANE DOE (2017-28), | ) ) ) | Karel A. Lehrman, Clerk |
| Respondent-Appellants, and | ) ) ) | |
| GUARDIAN AD LITEM, | ) ) | |
| Intervenor-Respondent. | ) ) ) | |

Appeal from the Magistrate Court of the Fourth Judicial District for the State of Idaho in and for Ada County. Hon. Cathleen MacGregor Irby, Magistrate Judge.

The judgment of the magistrate court is affirmed.

John R. Shackelford, Ada County Deputy Public Defender, Boise, for John Doe.

Theresa A. Martin, Meridian, for Jane Doe.

Hon. Lawrence G. Wasden, Attorney General, Boise, for Respondent.

Elijah M. Watkins, Boise, for Intervenor.

BEVAN, Justice

John Doe (2017-27) ("the father") and Jane Doe (2017-27) ("the mother") appeal judgments from the magistrate court terminating their parental rights to their daughters ("Z.W." and "N.W."). The magistrate court terminated the mother and father's parental rights on the grounds of neglect,

1

abuse, inability to discharge parental responsibilities, and chronic abuse and/or neglect, and also found termination was in the best interest of the children. The mother only challenges the termination of her parental rights as to N.W., while the father challenges the termination of his parental rights as to both of the children. The sole issue the father asserts is that the magistrate court did not have substantial and competent evidence to find terminating his parental rights was in the best interest of both children. We affirm the magistrate court's judgments.

## I. FACTS AND PROCEDURE

On March 16, 2007, Z.W. was born prematurely in California. Due to her premature birth she was placed in the Neonatal Intensive Care Unit ("NICU") for over twenty-five weeks. At the same time Z.W. was born, the mother was diagnosed with a chronic kidney condition. The doctors discovered that the mother had only one kidney, which was abnormally small. As a result of her condition, the mother was very weak and fatigued, often sleeping up to twelve hours a day. On July 13, 2007, Z.W. was placed into foster care because her parents did not visit her consistently while she was in the NICU. The mother and father were separated at this time. The father was in Washington State with the intent to earn money to pay off medical bills. The father stated that the mother remained in California, which he assumed was to care for Z.W.

When the father returned to California (three to four months after Z.W was born) child protective services had already declared that Z.W. was abandoned. At this point, the father learned the mother had left Z.W. in the hospital and was not visiting her. The father was eventually able to regain custody of Z.W. by working with child protective services in California, which required him to learn about Z.W.'s developmental needs and participate in her therapies. In March 2009, Ventura County Child Protective Services received referrals with concerns that Z.W. was not receiving appropriate services for her medical needs and had missed appointments with her medical providers. By this time, the mother and the father reconciled and were back together. The father then followed through with obtaining medical services for Z.W. in April 2009.

In July 2009, the mother, father, and Z.W. moved to Kuna, Idaho. After moving to Idaho, the Idaho Department of Health and Welfare ("IDHW") received six referrals regarding this family between January 2011 to December 2014. The first referral was received in January 2011, with concerns that Z.W. (then age three) had bruising on her back and side. The father admitted he caused this bruising on Z.W. by spanking her with a wooden spoon. The father stated he felt ashamed and

2

embarrassed for harming Z.W. and stated it would never happen again. It was reported that the mother was not concerned with the harm done to Z.W. At this point, law enforcement did not declare that Z.W. was in imminent danger. Rather, both parents were told by social worker Stephens to obtain education regarding their reasonable expectations of Z.W. based on her developmental age rather than her chronological age. The father also agreed not to use physical discipline until he could get his emotions and frustrations under control and to complete an anger management evaluation.

The second referral was received in February 2011, with concerns that Z.W. had marks down the back of her arms, a bruise under her chin, and a swollen jaw. Social workers responded by visiting the home. They observed the marks on Z.W.'s upper arms, which the father stated may have occurred when he forcefully grabbed Z.W. when directing her to go to the bathroom. Further bruising was then observed on Z.W.'s buttock, which the father admitted was from when he spanked Z.W. a couple of days prior. The father specifically stated he put Z.W. across his knee and spanked her five times with his hand because Z.W. was not eating her food. When asked if he would continue to spank Z.W., the father stated he would continue to spank her and that such method of discipline was "set in stone." At this point, Z.W. was declared to be in imminent danger and placed in foster care because of the father's physical abuse and the mother's inability to protect Z.W. from such physical abuse.

Z.W. was then examined by a pediatric nurse employed at St. Luke's C.A.R.E.S. The nurse noted that Z.W. had significant bruising across her back. Specifically, the nurse noted Z.W. had deep tissue bruising and bleeding which was palpable, which meant that blood could be felt pooling under Z.W.'s skin. She concluded that Z.W. had experienced non-accidental physical trauma. The nurse also believed, given the location of Z.W.'s injuries, they could have been much more serious. However, the blood work did not reveal any bleeding or bruising in Z.W.'s kidneys or spine. The father was arrested and pled guilty to misdemeanor injury to a child.

The third referral was received in June 2011, because the mother was giving birth to her second child (N.W.) who could also be subject to abuse. N.W. was also born prematurely (weighing only three pounds) and put in the NICU. The mother and father regularly visited N.W. while she was in the NICU and N.W. was discharged into their care after one month with in-home nursing and family preservation classes recommended. This third referral was dismissed as unsubstantiated.

During this time, IDHW allowed the parents to have unsupervised visits with Z.W. The parents were also provided with protective parenting education, domestic violence treatment, and

psychological services. In September 2011, Z.W. returned to her parents for an extended home visit. In a progress report dated January 31, 2012, a social worker noted that the mother had improved and completed her protective parenting classes, and the father stated he would not use spanking as a form of discipline with Z.W. because he recognized the emotional impact of physical discipline. Z.W.'s case was vacated in February 2012.

In April 2012, Z.W. (then age four) disclosed to a social worker that her parents punished her on two occasions by forcing her to take a cold shower because she soiled her pants. During a safety assessment, the parents denied giving Z.W. cold showers as a form of punishment. At this safety assessment, the social worker was also informed that the parents discontinued Z.W.'s developmental services. Prior to March 2012, Z.W. had received twenty hours per week of developmental services, but the father requested these services be terminated because he wanted to spend more time with Z.W.

The fourth referral was received in May 2013, with concerns that Z.W. disclosed that the mother had put her in an ice cold bath as punishment for soiling her pants, and that the mother would hit Z.W. with a broom and lock her in the bathroom. The referring party also reported that Z.W. often waited for her school bus outside in the dark by herself. Another safety assessment was conducted, in which no injuries were observed on either Z.W. or N.W. The father admitted that he left Z.W. waiting outside for the bus one time but then realized she was too young. He denied using ice baths as a form of punishment and instead stated he used time outs, sent Z.W. to her room, and spanked Z.W. for punishment. This referral was then closed as unsubstantiated.

The fifth referral was received in January 2014, with concerns Z.W. came to school wearing the same clothes and looked unkempt. The referral further stated Z.W. had poor toilet hygiene, missed a lot of school, and her parents did not walk her to the bus in the morning despite her age and significant developmental delays. Social workers responded to the home of the family, but were not allowed inside the home. Rather, the parents spoke to the social workers at the front door. The father stated Z.W. did not attend school because she had missed the school bus and that he bathed both children twice a week. The mother made no comments regarding the social worker's concerns. The social workers then advised the father to drive Z.W. to school if she missed the bus and to bathe the children every other day.

The sixth referral was received on December 3, 2014, with concerns of physical injuries observed on Z.W. at school. Z.W. had welts and bruises on her back. Z.W. told the school resource

officer that her injuries were the result of her father spanking her with a shoe. The school resource officer then responded with a home visit, in which the father stated that Z.W. had been acting up in school the day prior and, therefore, he spanked her about ten times with a rubber shoe insole. The father further noted that it was normal practice to hit his children until it hurt, which was usually about three strikes; however, this time he hit her ten times. Apparently, the lack of response from Z.W., while the father was spanking her, seemed to incite him to spank her more. The father was reportedly surprised when the officer showed him photographs of Z.W.'s back and stated: "Yikes. If I did that I went a little overboard." The mother was in the home when the father spanked Z.W. The mother stated that she heard Z.W. crying but was not concerned and, therefore, did not intervene. The officer noted that the mother was extremely quiet throughout the entire visit. The father further stated he would continue to spank the children. The officer then declared both children were in imminent danger and put them into foster care because of the physical abuse of Z.W. by her father, and the failure of the mother to protect the children. The father later pled guilty to felony injury to a child and was placed on probation. As a condition of the father's probation, a no contact order (which expires in 2022) was issued. The order prohibited the father from having contact with Z.W. unless his visits were supervised by the IDHW.

While the children were placed in foster care, both parents were ordered by the court to participate in identical case plans with the same goal: to have a safe, stable, and healthy home environment for the children to grow and develop and to meet their needs for safety, permanency and well-being. While in foster care, the parents were allowed to have supervised visits with the children.

Almost two years later, on November 23, 2016, IDHW filed a Petition for Termination of Parent Child-Relationship. The Petition alleged that both parent's rights should be terminated due to neglect, abuse, inability to discharge parental responsibilities, and chronic abuse and/or neglect. The Petition further alleged that it was in the best interest of the children to terminate the rights of both parents. On September 4, 2017, the magistrate court terminated the mother and father's parental rights on the grounds of neglect, abuse, inability to discharge parental responsibilities, and chronic abuse and/or neglect, and also found termination was in the best interest of Z.W. and N.W. The mother only challenges the termination of her right to N.W., while the father challenges the termination of his rights to both the children. The father does not appeal the statutory ground for terminating his parental rights, but only claims the magistrate court did not have substantial and

5

competent evidence to find terminating his parental rights was in the best interest of both the children.

## II. STANDARD OF REVIEW

This Court has recently set forth the relevant standard of review in *Idaho Department Health & Welfare v. Doe:*

> Grounds for termination of parental rights must be shown by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child. Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court is required to conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment because the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties.

150 Idaho 36, 41, 244 P.3d 180, 185 (2010) (quotations and citations omitted).

## III. ANALYSIS

### A. The magistrate court had substantial and competent evidence to terminate the mother's parental rights to N.W.

A court may grant an order terminating parental rights where it finds that (1) termination of parental rights is in the best interest of the child; and (2) one or more of the conditions listed in Idaho Code section 16-2005 exists. I.C. § 16-2005. The conditions that allow for termination include the following: (1) abandonment; (2) neglect or abuse; (3) lack of a biological relationship between the child and a presumptive parent; (4) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals or well-being of the child; and (5) the parent is incarcerated and will remain incarcerated for a substantial period of time. *Id*. The statutory conditions listed in section 16-2005 are "independent and if any one or more of the grounds for termination are found, termination may be granted." *Matter of Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). In this case, the mother's parental rights were terminated (as to N.W.) on the conditions of neglect and inability to discharge parental responsibilities. The magistrate court had substantial and competent evidence to terminate the mother's parental rights on these grounds.

1.  <u>The magistrate court had substantial and competent evidence to terminate the mother's parental rights for neglect.</u>

The magistrate court found that the mother neglected N.W. "Neglected" is defined as either: (1) situations where the parent has failed to comply with the court's order or case plan in a child protective act case, and IDHW had temporary or legal custody of the child for fifteen of the most recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month; or (2) any condition defined in Idaho Code section 16-1602(31). I.C. § 16-2002(3)(b). The magistrate court found the mother had neglected N.W. pursuant to both these definitions. The magistrate court had substantial and competent evidence to find the mother neglected N.W. pursuant to both these definitions.

a.  <u>There was substantial and competent evidence that mother failed to reunify with N.W. after an extended period.</u>

It is undisputed N.W. had been in continuous custody of IDHW for well over twenty-two months at the time of trial. IDHW gained custody of N.W. on December 5, 2014, and the trial began on June 12, 2017. Therefore, the time limitation set forth in section 16-2002(3)(b) was met. With regard to the failure to complete the case plan, the mother states "[t]here was an abundance of testimony regarding all the services in which Mother participated in and completed." Nevertheless, the mother does not point to any evidence in the record to support this conclusory statement. "When issues on appeal are not supported by propositions of law, authority, or argument, they will not be considered." *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). "Even in an appeal from the termination of parental rights, [the Court] will not consider an issue which was not supported by cogent argument and authority." *In re Doe*, 156 Idaho 103, 109, 320 P.3d 1262, 1268 (2014) (quotations and citations omitted).

Even if we were to consider the mother's argument, it is not persuasive based on this Court's decision in *Idaho Department of Health and Welfare v. Doe (2016-47)*, 162 Idaho 236, 395 P.3d 1269 (2017) ("*Doe I*"). In that case, a mother argued that termination was inappropriate because she "participated greatly" in her case plan. 162 Idaho at ___, 395 P.3d at 1278. This Court found this argument was unpersuasive and upheld the termination of her parental rights. Similarly here, even if the mother participated greatly in her case plan, she failed to complete her case plan pursuant to section 16-2002(3)(b). The goals of the mother's case plan were to have a safe, stable, and healthy

home environment for the children to grow and develop. In order to accomplish these goals the mother was required to accomplish eight different tasks.[1]

Ms. Baker-Jambretz (the IDHW case manager assigned to Z.W. and N.W.) testified as to the mother's progress on each of the tasks. She concluded that the mother failed to accomplish several of the tasks and the overall goals of her case plan. Specifically, Ms. Baker-Jambretz noted that the mother: 1) failed to consistently or effectively implement any of the parenting techniques she was taught; 2) participated minimally; and 3) consistently lacked motivation in completing her case plan. The Guardian Ad Litem for both children ("GAL") also testified about the mother's failure to complete her case plan. There was substantial and competent evidence to support the magistrate court's determination that the mother failed to complete her case plan and that IDHW had legal custody of N.W. for fifteen of the most recent twenty-two months without reunification. As such, we affirm the magistrate's judgment.

b. Pursuant to the definition of "neglected" within Idaho Code section 16-1602(31), there was substantial and competent evidence the mother neglected N.W. for inability to parent.

Under Idaho Code section 16-1602(31) a neglected child is one "[w]ho is without proper parental care and control, or subsistence, medical or other care or control necessary for h[er] well-being because of the conduct or omission of his parents. . . ." In making this determination the court may consider both past and current conduct. *See Idaho Dep't of Health and Welfare v. Doe (2011-18)*, 152 Idaho 644, 648, 273 P.3d 685, 689 (2012).

The magistrate court found the mother neglected the children because she "lack[ed] appropriate parenting and/or disciplinary skills . . . failed to demonstrate the ability to meet the children's needs . . . [and failed] to demonstrate any significant changes to [her] parenting strategies." The magistrate court noted this was despite "the overriding consensus from every service provider, doctor, therapist and social worker" that the mother was provided with a tremendous amount of services and was not able to demonstrate any significant change to her parenting

---

[1] The court ordered the mother to do the following: (1) participate in a parent-child comprehensive attachment assessment and follow all recommendations of the assessment; (2) sign releases of information; (3) address and meet the needs of the children consistently; (4) obtain an updated psychological evaluation and follow all recommendations; (5) complete a developmental disability application for Z.W.; (6) complete a developmental disability application for N.W.; (7) participate in parent education to learn how to parent the children's developmental ages and demonstrate the skills learned during visits with the children, home visits with the Department and GAL, and interactions with others; (8) participate in PCIT with both children to improve their parenting skills and the quality of the parent-child relationship and demonstrate skills learned.

strategies. The magistrate court also found that the mother neglected N.W. because her "untreated mental health issues and/or physical health issues impair her ability to provide proper parental care and control." The court noted:

> [The mother] is a meek, passive, submissive, medically fragile, emotionally compromised person who cannot live independently and had relied on [the father] to manage her life, attend to their needs and raise and parent their children. For years, [the mother] stood idly by while [the father] severely neglected and physically abused Z.W. on three separate occasions; resulting in two criminal convictions and years of involvement with child protective services.

The mother first claims the magistrate court erred in finding her mental and physical conditions impair her ability to parent because she developed a safety plan in case the father ever started to physically abuse N.W. The mother primarily points to testimony of her therapist, in which the therapist states she felt the safety plan was adequate to protect the children and it seemed as if the mother would follow through with the plan because she showed increased confidence and self-esteem. This Court was presented with a similar issue in *Idaho Department of Health and Welfare v. Doe (2016-32)*, 161 Idaho 754, 390 P.3d 1281 (2017) ("*Doe II*"). In that case, IDHW initiated termination proceedings because the "[m]other lacked capacity to protect [the children] from harm and was endangering [the children] by routinely placing them with her abusive boyfriend." *Id.* at 760, 390 P.3d at 1287. Thereafter, the magistrate judge terminated the mother's parental rights on the basis of neglect because of the mother's inability to protect her children from the boyfriend, among other reasons. *Id.* Despite improvements in the mother's behavior, this Court upheld the magistrate's decision to terminate the mother's parental rights. *Id* at 761, 390 P.3d at 1288. ("We find no error in the magistrate's conclusion that Mother's recent and modest improvements were insufficient to overcome her history of demonstrated unfitness.").

Similar to *Doe II*, because of the mother's inability to protect her children from the father the magistrate court had substantial and competent evidence the mother neglected her children. Testimony suggests that the mother is not strong enough mentally to stand up to the father and enforce her safety plan. Dr. David Delawyer performed psychiatric evaluations of the mother. Dr. Delawyer is a licensed psychologist in the State of Idaho and had conducted over 2000 psychological examinations during his career. Dr. Delawyer concluded:

> As part of her previous case plan, [the mother] agreed to implement a safety plan and call law enforcement and Health and Welfare if her husband became physical with [Z.W.] and harmed her or might harm her. She said she did not intervene during the

recent incident and implement her safety plan after [Z.W.] was spanked by her husband because she didn't know he had gotten "out of hand" and didn't know there was bruising. When asked if she <u>would</u> implement the plan if she knew these things [the mother] said "probably" and then "most likely." In the examiner's opinion, she is highly unlikely to act protectively and implement a safety plan in the future when similar circumstances occur. Her husband makes the decisions in the family and [the mother] is passive and unassertive. She is extremely unlikely to go against his wishes and act protectively.

(Emphasis in original). This conclusion is illustrated by two separate incidents observed where the mother unsuccessfully attempted to assert herself against the father during visitations with the children. In one instance a report submitted to the magistrate court noted:

[O]n October 17, 2016, [the mother] attempted to protect [N.W.] by saying "Back" to the father when he was being aggressive with his words and action regarding the toothpaste and did not follow through with her effort because [the father] ignored [the mother] and [the mother] sat down.

Testimony further supports the conclusion that if N.W. were to return to the mother's custody, N.W. would likely be subject to physical abuse. This is because historically Z.W. was the scapegoat in the family and took the brunt of the father's abuse. However, if Z.W. is no longer present (due to the no contact order between Z.W. and the father) N.W. would likely become the target of the father's physical abuse and the mother would likely not deploy the safety plan or intervene. This is illustrated by the fact that the mother has failed to intervene on at least three documented instances in the past while the father was physically abusing Z.W.

The mother also claims the magistrate court erred in finding her mental and physical conditions impair her ability to parent by pointing to testimony in the record that her self-esteem had improved and that she had become more actively engaged with her children. Although the mother may have made some improvements, this Court has held that despite improvements in a parent's behavior, their rights can nonetheless be terminated when they have demonstrated they are unfit to be a parent. *See Doe I*, 162 Idaho at ___, 395, P.3d at 1278 ("[A]lthough Doe made occasional slight improvements, overall she demonstrated an inability to discharge parental responsibilities by failing to make progress with her visitation behavior, employment status, substance abuse, or mental health evaluations. Accordingly, Doe's argument fails.").

Despite testimony regarding the mother's improvements, she has shown an inability to parent because of her mental and physical conditions. We hold the magistrate court had substantial and competent evidence that she neglected N.W. and we affirm the judgment.

10

2.      The magistrate court had substantial and competent evidence that the mother had the inability to discharge her parental responsibilities.

Idaho Code section 16-2005(1)(d) provides the Court with the authority to terminate parental rights when it finds "[t]he parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." The magistrate court found the mother had the inability to discharge her parental responsibilities because she "lacks the energy and/or ability and/or motivation to be an engaged and protective parent." The mother claims the magistrate court erred in making this finding because testimony in the record shows her parenting abilities improved.

In *Doe I*, this Court was presented with a similar issue. 162 Idaho at ___, 395 P.3d at 1278. In that case, the magistrate court terminated a mother's parental rights in part "because [the mother's] unresolved mental health issues rendered her unable to discharge her parental responsibilities." *Id.* at ___, 395 P.3d at 1278. This Court upheld the magistrate's decision noting "although [the mother] made occasional slight improvements, overall she demonstrated an inability to discharge parental responsibilities by failing to make progress with her visitation behavior, employment status, substance abuse, or mental health evaluation." *Id.*

Similar to *Doe I*, despite the mother's slight improvements, there was substantial and competent evidence for the magistrate court to find the mother lacks the ability to discharge her parental rights. The GAL for both children noted that the mother cannot read the children's cues concerning their basic needs. During supervised visits the mother appeared "zoned out" as if "the lights are on, but no one is home." On one visit the mother left without telling anyone or ensuring someone else would be responsible for the children. The GAL further described that over the two years she observed that: during 20% of the visits with the children both parents seemed to have worked hard to use their skills they had been taught; during 70% of the visits the parents seemed to have been ambivalent about the process; and that during 10% of the visits the parents behaved inappropriately. Due to this, in part, the GAL noted that the children would not be safe if they were returned to the mother's custody. The magistrate court explained the GAL's (Ms. Walsh's) testimony:

> Ms. Walsh described how PCIT classes were intended to teach [the parents] to use parenting techniques such as "labeled praises" with their children. She said that after attending the classes the [parents] used those techniques only sporadically.

11

Ms. Walsh noted that the [parents] had been using those techniques more recently during their visits but felt it was related to the upcoming court dates.

Ms. Baker-Jambretz also testified regarding the mother's parenting ability. The magistrate court described Ms. Baker-Jambretz's testimony as:

> [The mother] has not displayed a greater understanding of what her children experienced and the repair work required by her to successfully reunify with them. Additionally she said that during visits with her children, [the mother] does not consistently use the tools she was taught in the many programs she participated in.
>
> Ms. Baker-Jambretz described [the mother] as an "observer" during visits with her children. She said [the mother] is removed from the visit activities and does not consistently participate or engage. She said, sometimes [the mother] will appear playful but the overall . . . quality of her visits is consistently poor.

Ms. Baker-Jambretz further noted that the mother and N.W. appear to have a bond and that the mother has made some improvements in her parenting ability. However, Ms. Baker-Jambretz concluded that those improvements diminished over the three months prior to trial and that they were insufficient to warrant reunification.

Accordingly, despite the mother's improvements in her parenting abilities, the magistrate court had substantial and competent evidence that the mother lacked the energy and motivation to discharge her parental responsibilities. We affirm the magistrate's judgment.

**B.      The magistrate court had substantial and competent evidence to find termination of the mother and father's parental rights was in the best interest of the children.**

The only issue the father asserts as error in this case is the court's determination that termination was in the best interests of the children. The mother makes a similar claim as to N.W. Once a statutory ground for termination has been established, the magistrate court must next determine:

> . . . whether it is in the best interests of the child to terminate the parent-child relationship. When considering the best interests of the child, a trial court may consider numerous factors. While a comprehensive list of factors a court must consider does not exist, this Court has considered the following: the stability and permanency of the home, unemployment of the parent, . . . improvement of child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. Additionally, this Court has considered the testimony from IDHW social workers, and guardians ad litem.

12

*Doe I*, 162 Idaho ___, 395 P.3d at 1277 (internal citations and quotations omitted). The magistrate court concluded that it was in the best interest of the children to terminate both the mother and father's rights because they lack the appropriate parenting skills to protect their children. The magistrate court concluded:

> In conclusion [the mother and father] failed to demonstrate a sincere commitment to completing their case plan, they failed to make genuine improvement to their parenting skills and protective capacities and *their children would not be safe in their care*.
>
> Therefore, termination of [the mother and father's] parental rights is in the children's best interest.

(Emphasis added).

The father argues that the district court erred by concluding that he failed to internalize the parenting techniques he was taught. The father alleges the testimony of Ms. Baker-Jambretz (that the magistrate court relied on) was biased. Ms. Baker-Jambretz testified at length that the father did not internalize the parental training he received, is not invested in making necessary changes in his parenting, and that she was gravely concerned that he will revert to his past abusive behaviors. The father points to no evidence to prove bias, except the fact Ms. Baker-Jambretz had the opinion that the father's rights should be terminated. "This Court must conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties." *Doe I v. Doe II*, 161 Idaho 532, 535, 387 P.3d 785, 788 (2016) (quotations and citations omitted). We will defer to the magistrate court's determination of credibility.

Second, the father claims the magistrate court relied on subjective, rather than objective evidence, and did not give enough weight to his own testimony (and that of other witnesses) that his parenting ability has improved. Father further claims that the court relied too much on past events and not on the progress the father ostensibly made. This Court disagrees. The father testified that he used the parenting techniques he was taught at "every opportunity" and was even able to explain these techniques at trial. The father also points to testimony from other witnesses stating that his parenting ability has improved. Despite this evidence, "this Court does not reweigh evidence, but defer[s] to the trial court's unique ability to accurately weigh the evidence and judge the demeanor of the witnesses and take into account the trial court's 'superior view of the entire situation." *Doe v.*

13

*Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009). The magistrate court heard testimony from at least four other witnesses that both parents' parenting skills have diminished and/or they failed to internalize the parenting techniques they were taught. The magistrate court explained:

> [The father and mother's] parenting skills may have improved to the extent that they may know more about what is appropriate vs. inappropriate parenting or discipline and they may have developed more skills regarding various parenting techniques. However, neither parent has internalized the information provided to them. If [the parents] had truly internalized new parenting philosophies and discipline techniques it would have been obvious during visits with their children; gradual changes would have started to naturally appear without being forced.

> No matter how intensely [the parents] express that they want to change or have changed how they parent, there is simply no credible evidence to convincingly support their perceptions. *[Father] cannot let go of his need to control almost everything that has to do with his wife and children. Even after two years of therapies and classes, [father's] behaviors and moods are often still unpredictable, inconsistent and dysregulated and he continues to startle and frighten the children.*

(Emphasis added).

The magistrate noted as well that the parents seem to view this case from a subjective lens of their own, rather than from an objective one. The court concluded "Until [the parents] are able to see themselves through the 'actual objective lens' and gain the necessary insight into why they are not safe and protective parents, they will never be amendable [sic] to intervention or treatment; their circumstances will never change; and their children will always be at risk in their care." The court thus exercised objective judgment, based on substantial and credible evidence, to conclude that the children's best interests favored termination of the father's rights. No witness other than the parents testified they thought the father could be a safe and protective parent. Accordingly, we defer to the magistrate court's judgment in weighing the evidence. There was substantial and competent evidence to find termination of the father's parental rights was in the best interest of the children.

The mother similarly claims the district court erred by failing to take into account her own testimony. The magistrate court found the mother's testimony was disingenuous. For the same reasons as stated above, we will defer to the magistrate's judgment in weighing the mother's testimony. Second, the mother points to the testimony of Ms. Noggle (a social worker who testified at trial) that N.W. had a strong bond with the mother and that it would be detrimental for N.W. to lose her relationship with her parents. This Court was presented with a similar case in *Doe I*, 162 Idaho 236, 395 P.3d 1269. In that case, the mother argued "it is not in the best interests of the

Children to terminate her parental rights because severing the parent-child relationship would be devastating to the Children." *Id.* at \_\_\_, 395 P.3d at 1278. This Court dismissed that argument stating: "Doe fails to cite authority supporting her claim that the Children's devastation should outweigh facts that suggest that termination of the parent-child relationship is in the Children's best interest. Accordingly, we affirm the magistrate court's judgment." *Id.* at \_\_\_, 395 P.3d at 1269. Any claim that N.W. might be devastated from the termination of the mother's rights alone does not override facts demonstrating termination was in the best interest of the child.

## IV.  CONCLUSION

Based on the foregoing analysis, we affirm the magistrate court's judgments terminating the mother and father's parental rights.

Chief Justice BURDICK, Justice BRODY, Justice *pro tem* GRATTON and Justice *pro tem* MELANSON, CONCUR.