IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 51937

| In the Interest of:  Jane Doe II, A Child | ) | |
|---|---|---|
| Under Eighteen (18) Years of Age. | ) | |
| STATE OF IDAHO, DEPARTMENT OF | ) | Filed:  December 10, 2024 |
| HEALTH & WELFARE, | ) | |
| | ) | Melanie Gagnepain, Clerk |
| Petitioner-Respondent, | ) | |
| | ) | THIS IS AN UNPUBLISHED |
| v. | ) | OPINION AND SHALL NOT |
| | ) | BE CITED AS AUTHORITY |
| JANE DOE (2024-25), | ) | |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Appeal from the Magistrate Division of the District Court of the Sixth Judicial District, State of Idaho, Bannock County.  Hon. Anson L. Call II, Magistrate.

Judgment terminating parental rights, affirmed.

David R. Martinez, Chief Bannock County Public Defender; Stephanie Ann Ray, Deputy Public Defender, Pocatello, for appellant.

Hon. Raúl R. Labrador, Attorney General; Jason R. Chandler, Deputy Attorney General, Pocatello, for respondent.

_____

TRIBE, Judge

Jane Doe (2024-25) appeals from the judgment terminating her parental rights.  We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Jane Doe is the mother of the child in this action.  At the time of the child's birth in May 2022, Doe was sixteen years of age and on juvenile probation.  Doe's probation officer contacted the Idaho Department of Health and Welfare and reported that Doe did not have stable housing, transportation, employment, or the financial means or skills necessary to independently support herself and the child.  In August 2022, the Department removed the child from Doe's care and

initiated shelter care proceedings. Also in August 2022, Doe was placed in shelter care under a separate case number.

Following an adjudicatory hearing, the first assigned caseworker (caseworker one) developed a case plan under the child's case, with a goal to achieve reunification between Doe and the child. In relevant part, the case plan included the following requirements: (1) to obtain stable housing; (2) to complete her high school education; (3) to gain employment to financially care for the child; (4) to attend parenting classes; (5) to comply with juvenile probation; (6) to complete a substance abuse and a mental health assessment and comply with the recommendations of those assessments; and (7) to cooperate with the Department.

The Department arranged for Doe and the child to reside together in the same foster care placement to promote bonding, allow Doe to develop parenting skills, assist Doe in obtaining stable housing, and aid in the ultimate goal of reunification. Initially, the foster care placement was successful and enabled Doe to comply with a significant portion of the case plan. Specifically, Doe enrolled in an alternative school that offered daycare within the facility. Doe also obtained part-time employment. The foster parent assisted Doe with enrolling in and successfully completing a mandatory mental health assessment, which resulted in a diagnosis of ADHD. The foster parent also helped Doe to improve her parenting skills and care for the child's basic needs. Nevertheless, Doe requested to be moved to a different foster home several times because of disagreements and conflicts with the foster parent. Doe struggled to follow the foster parent's directions regarding the child's care. Although the foster parent also reported concerns about Doe's disrespectful behavior towards the members of the foster family, the Department did not find it necessary to remove Doe from the first foster home.

The Department assigned a new caseworker (caseworker two) to Doe and the child. Shortly after, the foster parent requested Doe be removed from her home because Doe engaged in an inappropriate intimate relationship with her foster sibling. Moreover, the foster parent reported that the relationship with Doe was becoming tense and progressively more disrespectful. As a result, the caseworker arranged to move Doe and the child to a new foster home. Around this same time, Doe successfully completed her juvenile probation--one of the requirements outlined in the case plan. However, this success proved to be only temporary. After spending approximately six weeks in the second foster home, the foster parent requested Doe to be removed from the home.

2

According to the caseworker, the second foster parent cited conflicts between Doe and the foster family as the primary reason for removal.

Notably, the change between foster homes significantly impacted Doe's compliance with the case plan. Doe lost her job and ability to financially provide for the child. Doe could not complete her high school education because the second foster home was in an area without schools that could accommodate Doe's circumstances. Moreover, frequent moves between foster homes affected the stability of the child's housing. In short, any progress Doe achieved in the case plan during her placement in the first foster home was erased by the subsequent removal.

After the Department placed Doe in the third foster home, the foster parent expressed concerns about Doe's ability to care for the child's needs. The foster parent also reported that Doe frequently failed to change the child's diaper and did not properly dress and feed the child. When directed to perform these basic parenting tasks, Doe became agitated and confrontational. The Department assigned a new caseworker (caseworker three). Around this same time, things reached a critical point in the third foster home.

Although Doe and the third foster parent gave conflicting testimony during the termination trial, it appears Doe's inability to properly respond to the child's medical needs was the catalyst for the child's removal from the home. On an evening in June 2023, the child appeared to have suffered a seizure. The foster parent took Doe and the child to an urgent care center where the child was examined and prescribed medication. Sometime later that night, the child suffered another seizure. Doe notified the foster parent several hours after the episode. The foster parent took Doe and the child to the emergency room. The child underwent additional medical testing. At trial, the foster parent testified that prior to receiving the test results, Doe requested to go back home; however, when Doe testified, she insisted that she and the foster parent both received the test results before they left the emergency room. Sometime after they returned home, the child suffered another episode. Reportedly, the foster parent woke up Doe to tell her that the child had another seizure and that they needed to take the child back to the emergency room. Doe went back to sleep. The foster parent drove the child to the emergency room.

After the foster parent notified the Department about the events of that night, the child was removed from the foster home and placed in a new foster home. Doe remained in the third foster home until she turned eighteen in February 2024. To continue facilitating bonding and aiding in

3

reunification, the Department added supervised visitation to the case plan. While Doe and the child were residing in separate foster homes, two visitation coordinators each supervised Doe's visits with the child. Both coordinators noted that Doe was not prepared for the visits, did not have food or diapers for the child, did not take directions well, was not engaged with the child during the visits, and spent a significant amount of time on her phone rather than with the child.

Caseworker three, two visitation coordinators, and the parent trainer all noted that Doe completely withdrew from participating in the case plan and cooperating with the Department after she turned eighteen. Significantly, the Department then assigned Doe an independent living coordinator who was supposed to assist Doe with locating stable housing, finding transportation for appointments, gaining employment, completing her GED, and obtaining a driver's license. This program was not mandatory, and Doe declined to participate in it. Meanwhile, in the three months following Doe's birthday, she changed residences four times--each in a different town, changed jobs at least four times, failed to consistently attend her GED classes, completed only two out of the six mandatory parenting class goals, and did not obtain her driver's license. Doe also missed a significant number of visitations with the child. Doe blamed the lack of transportation, conflicting schedules, and sickness for her failure to attend. At some point, Doe refused to cooperate with the Department and declined any assistance from caseworkers and other Department representatives. Despite working on the case plan goals for almost two years, Doe had not successfully completed the majority of the case plan requirements.

In January 2024, approximately seventeen months after the initial removal of the child from Doe's care, the Department filed a petition for termination of parental rights. The petition alleged that Doe's rights should be terminated because of neglect and an inability to discharge parental responsibilities. Further the petition alleged that it is in the best interests of the child to terminate Doe's rights. The termination trial took place in April 2024. Notably, Doe arrived one hour and fifteen minutes late on the second day of the trial. In May 2024, the magistrate court issued a written order and found by clear and convincing evidence that Doe neglected her child and was unable to discharge her parental duties and that termination is in the best interests of the child. Doe timely appeals.

4

## II.

### STANDARD OF REVIEW

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. Idaho Code § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id.* Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe II*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). "Findings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence." *Id.* at 246, 220 P.3d at 1065 (quoting *Roe v. Doe*, 142 Idaho 174, 177, 125 P.3d 530, 533 (2005)). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* at 245-46, 220 P.3d at 1064-65. The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057,

1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## ANALYSIS

Doe argues that the magistrate court lacked substantial and competent evidence to make a finding of Doe's inability to discharge her parental duties. Doe also argues that the magistrate court erred in determining that she neglected the child. Specifically, Doe contends that substantial and competent evidence does not support the court's finding that Doe neglected the child through her inability to provide care under I.C. § 16-1602(31). Doe also contends there is insufficient evidence in the record to support a finding of neglect under I.C. § 16-2002(3)(b). Finally, Doe argues that the magistrate court's decision to terminate her parental rights is not in the best interests of the child. For the reasons set forth below, we reject all of Doe's arguments and affirm the judgment terminating her parental rights.

### A. Statutory Basis for Termination

A party is permitted to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. I.C. § 16-2005. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

The magistrate court found by clear and convincing evidence that the Department had established statutory grounds for termination through the inability to discharge parental responsibilities and neglect. Doe challenges the magistrate court's findings for each of these grounds.

### 1. Inability to discharge parental responsibilities

The court has authority to terminate parental rights when it finds "[t]he parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." I.C. § 16-2005(1)(d). Some factors frequently considered under this analysis are: (1) the parent's ability to change her

6

conduct to assume parental responsibility; (2) the parent's ability to meet the child's needs; and (3) the parent's ability to provide stability and certainty. *Idaho Dep't of Health & Welfare v. Doe (2017-21)*, 163 Idaho 83, 89, 408 P.3d 81, 87 (2017).

The magistrate court found that Doe was unable to discharge her parental responsibilities for a prolonged period of time because: (1) she lacked the skills necessary to provide for the child's basic needs; (2) she created an unstable environment for the child; (3) she failed to accept aid and support from the Department; and, most importantly (4) she did not improve her circumstances throughout the pendency of this case.

Doe argues that the magistrate court erred in making its determination regarding her ability to discharge parental duties.[1] First, Doe contends that she successfully discharged her parental responsibilities. Next, Doe asserts that her unaccommodated learning disability (ADHD) created difficulties in learning essential parenting skills from the caseworkers, foster parents, and other Department personnel. Finally, Doe contends that even if she lacked the necessary parenting skills at the time of the termination trial, she would obtain them within a short period of time. This Court does not find these arguments persuasive.

Doe's assertion that she was successful in discharging her parental duties is not supported by the evidence. The record indicates that Doe did not obtain safe and stable housing throughout the pendency of the proceedings despite being approved for a housing voucher. Doe's employment was sporadic and inconsistent. What appears to be the biggest factor in the magistrate court's decision was Doe's failure to improve her circumstances throughout the pendency of the case and progress in the case plan. At the time of the termination trial, Doe lacked housing, employment, education, transportation, and the financial means just as she did when this case originated. In addition, all foster parents, caseworkers, and visitation supervisors agreed that Doe required significant prompting to properly care for the child. On at least one occasion, Doe left the child unclothed for six hours until the third foster parent directed Doe to dress the child. The Department caseworkers, visitation coordinators, and foster parents also testified that Doe was unwilling to receive instruction on parenting skills and failed to follow directions. The first visitation

---

[1]     To support her arguments, Doe cites *Doe v. Roe*, 133 Idaho 805, 809, 992 P.2d 1205, 1209 (1999). However, *Roe* is distinguishable because the basis for termination of parental rights was neglect not inability to discharge parental duties. *Id.* at 808, 992 P.2d at 1208.

coordinator reported that, when she instructed Doe regarding the child's needs or care, Doe refused to talk to or look at the visitation coordinator. The conflict rapidly progressed, and the visitation coordinator requested to be reassigned from Doe's case. Finally, Doe failed to adequately care for the child's medical needs during seizures even with the assistance of an involved foster parent.

The record also reflects that Doe's failure to acquire essential parenting skills was not the product of a disability. Rather, it emphasized Doe's decision not to cooperate with the Department despite the efforts of multiple service providers to accommodate her. The magistrate court found that, following the mental health assessment, the Department caseworkers and the third foster parent and the guardian ad litem all assisted with enrolling Doe in mental health treatment. However, Doe refused to participate in the recommended treatment and resisted any medicinal intervention. The service providers took various approaches to assist Doe with programming, but she did not show improvement. On the contrary, Doe refused to cooperate with the Department, failed to inform her caseworkers about changing residences, and declined to accept any assistance from an independent living coordinator. Nothing in the record indicates that Doe's ADHD diagnosis prevented her from acquiring appropriate parenting skills and discharging them accordingly.

With respect to the requirement of a prolonged inability to parent, nothing in the record suggests that the mere passage of time would resolve Doe's difficulties. In fact, the opposite is true. When Doe reached adulthood she lost stable housing, could not obtain permanent and continuous employment, failed to attend visitations, completely withdrew her cooperation with the Department, and effectively stopped discharging her parental duties. Knowing her circumstances were less than ideal for successful reunification, Doe repeatedly declined aid from the Department that included: housing vouchers, services to assist in obtaining stable employment, temporary transportation, completing her GED, and obtaining a driver's license. As time progressed, Doe's decisions were counterproductive to providing a stable environment for the child and to effectively discharge her parental duties. Therefore, Doe has failed to show that the magistrate court erred in finding that her ability to care for the child would not improve in the foreseeable future.

This Court also notes that Doe's arguments are an attempt to have this Court reweigh evidence. It is well established that appellate courts in Idaho do not reweigh evidence. *Doe*, 144

Idaho at 842, 172 P.3d at 1117. The magistrate court's finding that I.C. § 16-2005(1)(d) justified terminating Doe's parental rights was, therefore, supported by substantial and competent evidence.

### 2. Neglect

Doe argues the magistrate court erred in finding that there was clear and convincing evidence that she had neglected her child. Specifically, Doe argues that she could not comply with the case plan requirements because they were impossible to follow in her situation. Doe also argues that the statutory requirement of neglect (that the child remain in the Department's custody for fifteen of the most recent twenty-two months) was not met. Statutory grounds for termination of parental rights are independent, and if any one or more of the grounds for termination are found, termination may be granted. *Idaho Dep't of Health & Welfare v. Doe (2016-11)*, 160 Idaho 824, 833 n.1, 379 P.3d 1094, 1103 n.1 (2016). Because this Court has already affirmed the magistrate court's finding that Doe is unable to discharge parental responsibilities, and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child, it is unnecessary to consider the other bases found by the magistrate court.

### B. Best Interests of the Child

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. State, Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, the improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *Doe (2015-03) v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *Idaho Dep't of Health & Welfare v. Doe (2013–15)*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that termination of parental rights is in the best interests of the child must be made upon objective grounds. *Idaho Dep't of Health & Welfare v. Doe (2011-17)*, 152 Idaho 953, 957, 277 P.3d 400, 404 (Ct. App. 2012). The trial court can also consider the likelihood of reunification or a parent's ability to change his or her conduct to assume parental responsibilities in determining the best

interest of a child. *State, Dep't of Health & Welfare v. Doe (2019-32)*, 166 Idaho 173, 179, 457 P.3d 154, 160 (2020).

The magistrate court found that termination is in the child's best interests primarily because, given Doe's circumstances, she could not achieve the stability and permanency the child required, even with the passage of time. Doe challenges the magistrate court's conclusion that termination of her parental rights is in the child's best interests.

First, Doe argues that termination of parental rights is not in the child's best interests because Doe can financially contribute to the child's care. Doe cites to various places in the transcript that are meant to support this argument. However, these citations to the transcript are either irrelevant to Doe's assertion or support the opposite. The first citation emphasizes that Doe did not have the stability, maturity, and sense of responsibility; the second citation discusses Doe associating with individuals not approved by probation; the third citation discusses who was responsible to notify Doe about her appointments; the fourth citation does not reference Doe at all and contains communications between the magistrate judge and attorneys; the fifth citation mentions that Doe had supplies for the child; and the last citation indicates that Doe did not have stable employment or income. Moreover, Doe's argument ignores additional factors examined and considered by the magistrate court in making the determination of the child's best interests. Doe fails to cite to any legal authority that suggests that financial well-being is the determining factor in the best interests of the child analysis. Therefore, Doe's argument is nothing but an invitation to reweigh the evidence, which this Court cannot do when substantial and competent evidence supports the magistrate court's findings. *See Doe*, 148 Idaho at 245-46, 220 P.3d at 1064-65.

Next, Doe also argues that termination of her parental rights is not in the child's best interests because Doe shares a strong bond with the child. While Doe, once again, does not cite to any legal authority, we acknowledge that a child's relationship with parents is a factor that the magistrate court may consider when determining the best interests of a child in a termination proceeding. *See Doe v. Doe (2018-20)*, 164 Idaho 511, 516, 432 P.3d 60, 65 (2018). However, it is only one factor in a multi-factor test, and Doe does not argue that it is or should be determinative or given greater weight. Though the magistrate court did not consider the child's bond with Doe as an independent factor, it addressed that Doe deeply cared about her relationship with the child.

After balancing this consideration and all factors that it found to be relevant, the magistrate court determined, by clear and convincing evidence, that termination is in the child's best interests. Therefore, without argument or authority showing that the magistrate court gave insufficient weight to the child's relationship with Doe, this Court will not reweigh the magistrate court's balancing of the best interests analysis factors. *See Idaho Dep't of Health & Welfare v. Doe (2017-27)*, 163 Idaho 367, 372, 413 P.3d 767, 772 (2018) (holding that, even in an appeal from the termination of parental rights, this Court will not consider an issue which was not supported by cogent argument and authority). Doe has failed to show error in the magistrate court's finding that termination of parental rights is in the best interests of the child.

Finally, Doe argues that the new adoptive family poses safety risks to the child. Doe particularly focuses on a member of the adoptive family who was accused of inappropriate behavior towards a young neighbor child. Doe asserts that this family member was allowed access to the child despite these accusations. Competent and substantial evidence does not support Doe's concerns about the child's current living conditions. At the termination trial, the adoptive mother and caseworker three each testified that accusations of inappropriate behavior did not result in formal charges. Caseworker three also testified that the adoptive mother utilized security cameras to ensure the child's safety. Finally, the adoptive mother denied ever leaving the child without her supervision. Outside of these accusations, the child was reported to be physically healthy and developmentally on track. Thus, substantial and competent evidence supports the magistrate court's finding that the child will achieve much needed permanency in the adoptive mother's care.

In sum, Doe has failed to show error in the magistrate court's finding that termination is in the child's best interests.

## IV.

## CONCLUSION

The magistrate court's findings that Doe lacked the ability to discharge parental duties, Doe neglected the child, and termination is in the child's best interests are supported by substantial and competent evidence. Doe has failed to show error in the magistrate court's decision to terminate her parental rights. Accordingly, the judgment terminating Doe's parental rights is affirmed.

Chief Judge GRATTON and Judge HUSKEY, **CONCUR**.

11