# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45995

In the Matter of:  JANE and JOHN DOE II, )
Children Under Eighteen (18) Years of Age. )
------------------------------------------------------------ )
JOHN and JANE DOE I, )
                         )
        Petitioners-Respondents, )
                         )
v.                               )
                         )
JANE DOE (2018-20), )
                         )
        Respondent-Appellant. )
                         )

Pocatello, September 2018 Term

Opinion Filed: December 21, 2018

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County.  Hon. Roger B. Harris, Magistrate Judge.

Judgment terminating parental rights, <u>affirmed.</u>

Twin Falls County Public Defenders Office, Twin Falls, for appellant.  Laura Z. O'Connell argued.

Roy Nielson Barini-Garcia & Platts, Twin Falls, for respondents.  Eric B. Nielson argued.

---

BURDICK, Chief Justice.

Jane Doe ("Mother") appeals the Twin Falls County magistrate court's termination of her parental rights to her minor children, Jane Doe II ("T.T.") and John Doe II ("D.T."). On February 7, 2017, John and Jane Doe I[1] ("Guardians") filed a petition to terminate Mother's parental rights to T.T. and D.T. that was amended on May 17, 2017. After holding a one-day trial, the magistrate court ("trial court") ordered written closing arguments by both parties. Afterwards, the termination petition was granted.[2] The trial court found: (1) Mother had neglected her children; (2) Mother had abandoned her children; and (3) termination of Mother's parental rights

---

[1] John and Jane Doe I are currently the children's primary caregivers. When this opinion refers to "Guardian" as a singular noun, it refers to Jane Doe I. When it refers to the plural, "Guardians," it refers to both John and Jane Doe I.

[2] The judgment also terminated any putative father's parental rights to the children, but that termination is not challenged on appeal.

1

was in the best interest of the children. Because each of these findings was supported by clear and convincing evidence, the trial court granted Guardians' request for termination. The trial court entered a final judgment to that effect on May 11, 2018. Mother timely appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mother voluntarily placed T.T. and D.T. under Guardian's care in December 2015. This voluntary placement was instigated by Mother's desire to avoid removal of the children by the Idaho Department of Health and Welfare ("the Department") which would have resulted in their placement in foster care. At the time of their placement, both T.T. and D.T. were less than two years of age (17 and 2 months old, respectively). At the time of this appeal, both children have remained in Guardians' exclusive care for over two-and-a-half years.

T.T. is the elder of the two children. When Mother first became pregnant with T.T., she initially told everyone at her workplace that she had cancer instead of explaining that she was, in fact, pregnant. Prior to T.T.'s birth, Mother asked one of her coworkers whether she might want to adopt T.T., who Mother claimed was her sister's child. Once T.T. was born, Mother would frequently leave T.T. in the care of others—sometimes for weeks at a time—and these caretakers would often purchase formula, food, diapers, clothing, and other items for the child. These caretakers would also arrange and pay for babysitting when they couldn't watch T.T. instead of Mother arranging for T.T.'s care. When Mother would deliver T.T. to others for supervision, T.T. would be hungry, fussy, and dirty to the point of matted hair and a diaper rash so severe that the child would be bleeding and have to be bathed immediately and ointment applied to the diaper rash. Mother appeared to show no tenderness toward the child and was usually taking T.T. from person to person so as to not have to care for the child herself.

D.T. is the younger of the two children. D.T.'s short life thus far has been marked by significant medical issues. D.T. was only in Mother's care for a period of less than two months which spanned the time from his birth until placement with Guardians. In that short time, D.T. had already experienced a trip to the emergency room for breathing difficulties. D.T.'s visit to the emergency room occurred the night before he was placed in Guardians' custody.

By the time D.T. was born, Mother no longer worked, had changed housing several times, and had settled in a house with other residents. Mother's practice of continuing to ask others to watch the children continued at the house. When no such arrangement could be secured, Mother would often leave the children alone and unattended while she watched

2

television upstairs or went outside to smoke cigarettes. It was around this time that Guardians began to care for T.T. and D.T., including caring for the children upwards of five days a week. Eventually, Mother's pattern of inattention to her children became a cause for concern for the residents of the house, and this concern prompted a call to the Department.

While there is some conflicting testimony as to what happened the morning the Department became involved, what is clear is that D.T. was left unattended in a bassinet for several hours while Mother went to work. Mother left D.T. to attend work but contends that she expected a babysitter to arrive shortly after her departure. In any event, a resident of the house awoke to find D.T. alone (T.T. was staying with Mother's parent at the time) and unattended in a bassinet. After discovering the newborn with no supervision, the resident, knowing that Guardian typically cared for the children during the week, contacted Guardian for advice. Guardian had, in fact, previously informed Mother that she would not be able to watch the children that morning. Eventually, the resident decided to contact the police, prompting Guardian to depart for the house and, after the police officer arrived, Guardian requested that the children be placed in her custody instead of placing them in foster care. The police officer contacted Mother, causing Mother to come to the scene where she eventually agreed to the children's placement with Guardians for the immediate future. Thereafter, Mother was given the option of placing the children either with Guardians or in foster care. Mother selected Guardians and a formal guardianship was put into place.

Once the guardianship was established, Guardians realized that T.T. exhibited a number of alarming behaviors. It became clear that T.T. had serious issues with hoarding food and self-stimulation. Guardian found T.T. to be hungry—eating to the point of pain. In addition, Guardian noticed that T.T. would frequently masturbate, going so far as inserting foreign objects into her vagina to the point of injury. These sexualized behaviors were especially alarming given that at the time the guardianship was established, T.T. was only a year and a half old. Given these concerns, Guardians sought the help of a licensed social worker for counseling for T.T.

The counselor observed that T.T. would masturbate daily, hoard food, and would never stop eating if food were available—to the point where T.T. would rummage through garbage cans looking for food. T.T.'s counselor opined that the child's issue with food is the result of periods of starvation during her very early childhood. The counselor testified that T.T.'s sexual behaviors likely stem from being sexually abused as an infant. The social worker testified that

3

girls of T.T.'s age do not usually recognize their genitals as sexual organs unless someone shows them how to masturbate, they are sexually abused, or they see someone else masturbating.

D.T. was less than two months old when he was entrusted into the care of Guardians. Guardians immediately took the newborn to see the family doctor given D.T.'s perceptible difficulty breathing and keeping food down. D.T. has several conditions that have required medical intervention including problems with reflux that causes difficulties with his larynx and trachea. He has issues keeping food down which necessitates placement of a feeding tube. Most recently, D.T. has developed seizures. These issues have required surgeries on both his stomach and the top part of his throat. As described by his doctor, D.T. is a sort of "moving target" given that his symptoms and conditions don't fit into well-defined syndromes or illnesses making his future medical needs unpredictable. D.T. currently receives nourishment from a feeding tube attached to a small backpack that he must constantly wear. Guardians have taken D.T. to all of his medical appointments, including those that are a considerable distance away from home, and paid for the portions of D.T.'s medical expenses not covered by insurance.

During the time her children were under the Guardians' care, Mother lived a nomadic lifestyle and used methamphetamine. For significant periods of time, Mother was homeless. While Mother has on occasion attempted to reach out to T.T. and D.T. during their time under Guardians' care, Mother has never attempted to reunite with her children. Mother moved back in with her own mother. Since then she has enjoyed some semblance of stability in her life and secured employment. Despite this stability, Mother is still not requesting to reunite with or regain custody of her children. She wishes the guardianship to continue regardless of the disposition of this case.

Guardians have been the exclusive caretakers of T.T. and D.T. Guardians have been present at every surgery, medical appointment, and counseling session while taking an active role in learning how to care for T.T. and D.T. and handle their physical and behavioral challenges. The children have bonded with Guardians over the course of the guardianship. The children consider themselves part of Guardians' family. Despite their hardships and obstacles, D.T. and T.T. have progressed and are thriving in Guardians' home. Even though D.T.'s medical issues are some of the most demanding his physician has ever seen, his physician is impressed by Guardians' ability to provide care for the infant. Likewise, T.T. has progressed in the counseling secured by Guardians. The children have had limited contact with Mother since the guardianship

4

began, but at least one visit from Mother caused T.T. to regress in much of her progress. The child suffered from uncontrollable bowel movements for several weeks after the visit. T.T.'s counselor opined that this regression was likely a negative emotional reaction to seeing her Mother.

On February 7, 2017, a little over a year after the guardianship was established, Guardians filed a petition to terminate Mother's parental rights to T.T. and D.T. as well as an amended petition on May 17, 2017. Subsequent to filing their petition for termination of parental rights and adoption, Guardians were the subject an Investigative Report and a Pre-Adoption Home Study Report by the Department. Both inquiries resulted in the conclusion and recommendation that the children remain with Guardians. After holding a one-day trial and the submission of written closing arguments by both parties, the trial court granted Guardians' petition on the basis that Mother neglected and abandoned the children and that termination was in the children's best interests. The trial court entered a judgment to that effect on May 11, 2018. Mother timely appeals.

## II.    ISSUES ON APPEAL

1. Whether there is substantial, competent evidence to support the trial court's determination that:
    a) Mother abandoned T.T. and D.T.;
    b) Mother neglected T.T. and D.T.; and
    c) terminating Mother's parental rights was in the best interests of T.T. and D.T.
2. Whether Guardians are entitled to attorney's fees.

## III.    STANDARD OF REVIEW

Pursuant to Idaho Code section 16-2005(1), "a court may terminate parental rights if it finds that doing so is in the best interest of the child and that at least one of five grounds for termination is satisfied." *In re Doe (2014-23)*, 157 Idaho 920, 923, 342 P.3d 632, 635 (2015). The enumerated grounds for terminating a parent-child relationship "must be proved by clear and convincing evidence." *In re Doe (2013-15)*, 156 Idaho 103, 105–06, 320 P.3d 1262, 1264–65 (2014); I.C. § 16-2009. As generally understood, the clear and convincing evidentiary standard is met when there is "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Doe Children*, 163 Idaho 536, 538, 415 P.3d 945, 947 (2018) (quoting *Idaho Dep't of Health and Welfare v. Doe (2015-01)*, 158 Idaho 764, 767, 351 P.3d 1222, 1225 (2015)).

5

On appeal, "the appellate court does not reweigh the evidence to determine if it was clear and convincing." *In re Doe (2014-09)*, 157 Idaho 14, 18, 333 P.3d 125, 129 (2014) (quoting *Dep't of Health and Welfare v. Doe*, 149 Idaho 207, 210, 233 P.3d 138, 141 (2010)). Where the trial court has explicitly noted that it applied the clear and convincing standard, the appellate court "will not disturb the [trial] court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision." *Doe I v. Doe II*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010). Substantial, competent evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006)).

In our review of the factual findings, "this Court will indulge all reasonable inferences in support of the trial court's judgment . . . ." *In re Doe (2013-15)*, 156 Idaho at 106, 320 P.3d at 1265 (quoting *In the Matter of Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991)). This Court considers that

> the finder of fact has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties. In parental-termination cases, this is immensely important. A cold record of the trial does not tell the whole story. An independent review by our court could not take into account the trial court's superior view of the entire situation.

*Id.*

## IV. ANALYSIS

**A. Mother has (1) waived the issues of neglect and abandonment on appeal for failure to support them with argument and (2) the trial court's determination that termination was in the children's best interests is supported by substantial, competent evidence.**

Termination of the parent-child relationship requires the satisfaction of a two-part finding: (1) at least one of the five bases for termination needs to be met, and (2) termination must be in the best interest of the child.

### 1. Bases for Termination under Idaho Code section 16-2005(1)(b)

On appeal, Mother does not make specific arguments as to how or why the trial court erred in its determination that Mother neglected and abandoned her children. Instead, Mother merely recites these issues in her statement of the issues on appeal while the bulk of her brief deals only with the best-interests-of-the-child prong of the termination statute. As a result, without argument or citation to advance the issues, she has waived these issues. *Bach v. Bagley*, 148 Idaho 784, 797, 229 P.3d 1146, 1159 (2010) ("Regardless of whether an issue is explicitly

set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court.").

## 2. Best Interests of the Children

Even if one of the statutory bases for parental-rights termination is found, termination is only proper if it is also in the best interests of the child. I.C. § 16-2005(1). The best interests analysis is an expansive analysis with "no set list of factors a court must consider . . . ." *In re Doe (2015–03)*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015). Nonetheless, this Court has articulated numerous factors that a trial court may consider, including a "parent's history with substance abuse, whether the parent has provided financial support, the child's relationship with those currently caring for him or her and whether the child has improved under that care, the child's need for stability and certainty, and the parent's incarceration." *Id*. Other factors include

> the parent's ability to change his or her conduct to assume parental responsibilities, whether there is a good relationship between the child and parent, whether the child has improved while in the parent's care, whether the child's needs are being met, and the parent's ability to provide stability and certainty.

*Idaho Dep't of Health & Welfare v. Doe I (2017-21)*, 163 Idaho 83, 89, 408 P.3d 81, 87 (2017).

The trial court found that "[c]onsidering all of the various factors involved, and weighing the children's current needs against the hope that [Mother] will ever be able to put herself in a position to safely reunite with the children, this court concludes that achieving some permanency for the children now is in their best interests at this point." This finding is supported by substantial, competent evidence in the record.

On appeal, Mother argues that termination is not in the best interests of T.T. and D.T. because "[Guardians] have failed to show that there would be any harm to the children if the termination of parental rights petition was denied." In support of this argument, Mother relies on *In re Doe (2014–09)* where this Court acknowledged that "the lack of any evidence showing that termination of a parent's parental rights is necessary to prevent harm to the children is a factor that the trial court can consider," in upholding a trial court's finding that termination of a biological father's rights was not in the best interests of the child as supported by substantial competent evidence. 157 Idaho 14, 17, 333 P.3d 125, 128 (2014). While this is a valid observation, this Court never intimated that this factor is a determining factor. *Id.* To the contrary, this Court has addressed Mother's exact argument and held this factor "is only one

factor in a wide-ranging analysis and not an overriding concern or emphasized principle." *Doe v. Doe (2016–45)*, 162 Idaho 194, 198, 395 P.3d 814, 818 (2017). Whether harm to the child will result from a termination of parental rights is simply an area of inquiry that the trial court may assess in its broad discretion to determine whether termination is in the best interests of the child.

Mother also argues that she has "corrected the problems that led to her agreeing to the original guardianship case." Mother supports this argument by pointing out she has successfully completed probation, has a full-time job, and her employer has a no-drug policy. While the parent's ability to change his or her conduct to assume parental responsibilities is a factor the trial court may consider, it is only one of many that goes into the best-interests analysis. This Court has held on prior occasions that the lower court did not err by finding that a parent's recent improvement is outweighed by the other factors of the best interests analysis. *See, e.g.*, *Idaho Dep't of Health & Welfare v. Doe (2011-18)*, 152 Idaho 644, 650, 273 P.3d 685, 691 (2012) (finding no error when the trial court "weighed the totality of the evidence and concluded that 'quite frankly it is too little, too late.'"); *Idaho Dep't of Health & Welfare v. Doe (2016-32)*, 161 Idaho 754, 761, 390 P.3d 1281, 1288 (2017) (finding "no error in the magistrate's conclusion that Mother's recent and modest improvements were insufficient to overcome her history of demonstrated unfitness.")

Ultimately, the focus of the best interests analysis rests with the best interest of the child, not the parent. Mother was employed when she left D.T. unattended at the house. Mother was intermittently employed during the period of time she failed to physically care for T.T. during the child's early life. Furthermore, this argument is unavailing because Mother's progress did not go unnoticed by the trial court. Rather, the trial court noted her progress, but expressly found:

> Allowing [Mother] additional time to try and put herself in the position to get the children back, hoping she might be successful, all the while knowing that she intends to leave the children with [Guardians], leads this court two [*sic*] the conclusion that allowing her additional time would be detrimental to the children's mental and physical well-being and would not allow them to achieve permanency.

Lastly, Mother urges this Court to adopt the Washington Supreme Court's holding in *In re Welfare of A.B.*, where that court held "that a parent has a constitutional due process right not to have his or her relationship with a natural child terminated in the absence of a trial court finding of fact that he or she is currently unfit to parent the child." 232 P.3d 1104, 1110 (2010), *as amended* (Sept. 16, 2010). This argument is unpersuasive. First, the decision of a sister state

is not binding on this Court. *State v. Elison*, 135 Idaho 546, 549, 21 P.3d 483, 486 (2001). Second, the requirement that the Washington Supreme Court imposes stems from its statutory scheme and the subsequent case law interpreting it. *See Krause v. Catholic Cmty. Servs.,* 737 P.2d 280, 284 (1987). Succinctly put:

> The Washington parental rights termination statutes require clear, cogent and convincing evidence of not only a prior determination that the parent has fallen below minimal standards, RCW 13.34.180(1), but of the fact that parental deficiencies still exist which are not likely to be remedied so that the child can be returned to the parent in the near future, RCW 13.34.180(5)

*Id.*

A requirement of current unfitness is not required under Idaho law. *See* I.C. § 16-2005. Furthermore, this Court has previously upheld termination of parental rights as being in the child's best interest despite recent lifestyle improvements on the part of the parent. *See Idaho Dep't of Health & Welfare v. Doe (2011-18)*, 152 Idaho at 650, 273 P.3d at 691 (finding sufficient evidence to support trial court's termination order where the trial court found parents improvements were "too little, too late."); *Doe (2016-32)*, 161 Idaho at 761, 390 P.3d at 1288 ("We find no error in the [trial court's] conclusion that Mother's recent and modest improvements were insufficient to overcome her history of demonstrated unfitness.").

The trial court's finding that termination of Mother's parental rights is in D.T. and T.T.'s best interests is supported by substantial, competent evidence. Mother has a history of substance abuse before, during, and after her time caring for the children**.** Mother has provided little to no financial support for the children while they were in her care and only minimal support while the children were under Guardians' care. Both children have thrived under Guardians' care. Both children are treated as members of the family by Guardians and Guardians' other children. Guardians sought termination in part to have both D.T. and T.T. placed on their family's health insurance. Both the Pre-Adoption Home Study and Investigative Report completed by the Department regarding the children's placement with Guardians recommended that the children stay with Guardians. The trial court agreed with each report's finding that delaying termination would not be in the children's best interests because the children deserve the permanency required to grow and develop.

T.T. exhibited extremely alarming behaviors for a child her age when she came into Guardians' care. Such behavioral issues appear to result from considerable and consistent neglect while in Mother's care. T.T. needs stability and certainty in order to progress and develop as a

child. Guardians offer that stability and consistency. Upon taking physical custody of T.T., Guardians immediately secured counseling for T.T. and have made considerable efforts to address her issues. When T.T. was reunited with Mother, even though it was only a brief meeting, the stress of the interaction was enough for T.T. to regress in her progress and suffer physical symptoms of anxiety. Based on these facts, there is substantial, competent evidence to support the trial court's determination that termination of Mother's parental rights is in T.T.'s best interest.

D.T. has spent almost his entire young life with Guardians. That life has been marked by taxing and recurring medical afflictions and treatment. Given the timeframe of D.T.'s time with Guardians, they are the only parent figures D.T. has ever really known. Guardians have stewarded D.T.'s tumultuous journey through his illnesses and remained an ever-present source of care and attention for the child. Given Mother's history of caring for T.T., it is difficult to envision Mother providing the adequate care and attention required by D.T.'s special needs. Based on these facts, there is substantial, competent evidence to support the trial court's determination that termination of Mother's parental rights is in D.T.'s best interest.

Therefore, the trial court's finding that termination of Mother's parental rights is in the best interests of the children is supported by substantial, competent evidence. Accordingly, we affirm the trial court's termination of Mother's parental rights to T.T. and D.T.

**B. Guardians' request for attorney's fees is denied because of the seriousness of the liberty interest at stake and the conflicting evidence in the record.**

Guardians raise the issue of attorney's fees in their reply brief. Guardians argue that they are entitled to attorney's fee under section 12-121 of the Idaho Code because "[Mother's] appeal has been brought frivolously, unreasonably and without foundation" and Mother "simply request[s] the appellate court to second guess the determination of the trial court."

An award of attorney fees on appeal is proper under I.C. § 12-121 only if this Court is left with the abiding belief that the appeal "was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. "Generally, when an appeal simply disputes the trial court's factual findings, which are supported by substantial although conflicting evidence, the appeal is considered frivolous and an award of attorney fees is proper under I.C. § 12–121." *Doe v. Roe*, 133 Idaho 805, 810, 992 P.2d 1205, 1210 (1999) (citing *Zanotti v. Cook*, 129 Idaho 151, 155, 922 P.2d 1077, 1081 (Ct. App. 1996)). That said, this Court has held that

"considering the seriousness of the liberty interest affected in parental termination cases," an appeal in such cases "to reexamine conflicting evidence is not frivolous." *Id.*

Because of the fundamental right implicated by the termination of parental rights and the conflicting testimony in this case, we deny Guardians' request for attorney's fees under Idaho Code section 12-121.

## V. CONCLUSION

The termination of Mother's parental rights is affirmed and Guardians' request for attorney's fees is denied. Costs on appeal are awarded to Guardians.

Justices HORTON, BRODY, BEVAN and STEGNER, **CONCUR.**

11