**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 47200**

| | |
|---|---|
| In the Matter of: John Doe I, )<br>A Child Under Eighteen (18) Years of Age. )<br>----------------------------------------------------- )<br>STATE OF IDAHO, DEPARTMENT OF )<br>HEALTH AND WELFARE, )<br> )<br>   Petitioner-Respondent, )<br> )<br>v. )<br> )<br>JOHN DOE (2019-19), )<br> )<br>   Respondent-Appellant. )<br>_____ )<br> | Boise, November 2019 Term<br><br>Opinion Filed: December 23, 2019<br><br>Karel A. Lehrman, Clerk |

Appeal from the Magistrate Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Thomas H. Borresen, Magistrate Judge and Calvin H. Campbell, Magistrate Judge.

Decree terminating parental rights is <u>affirmed</u>.

Timothy J. Williams, Williams Law Office Chtd., Twin Falls, for appellant.

Lawrence G. Wasden, Idaho Attorney General, Twin Falls, for respondent.

_____

BRODY, Justice.

John Doe ("Father") appeals from the magistrate court's judgment granting the Idaho Department of Health and Welfare's ("the Department") petition to terminate his parental rights to his son, A.V. The magistrate court concluded that the Department proved by clear and convincing evidence that Father and Jane Doe ("Mother") neglected A.V. and that termination was in A.V.'s best interests. Mother's termination is the subject of a separate appeal (Dkt. No. 47190). Father's main argument on appeal is that the magistrate court erred in terminating his parental rights because it is not in A.V.'s best interests to be separated from his siblings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

A.V., the child at issue in this case, went into foster care in November 2017, when he was approximately two-and-a-half years old. Mother acknowledged that A.V. went into care after she

1

had left him alone in an apartment. One Department social worker testified that he met with Mother a few days later and talked with her about the fact that A.V. was malnourished. He testified that Mother indicated A.V. previously had a hiatal hernia and that he was always going to have a problem gaining weight. However, after a Department investigation, and having A.V. examined by doctors, that did not turn out to be the case.

A.V. had been in shelter care once before from the time he was ten months old until he was about eighteen-months old. While in care, A.V. received physical therapy from a board-certified pediatric physical therapist. She worked with A.V. from July 2016 until he was returned to his parents in October of 2016. She testified that when she first began working with A.V., he was approximately four to six months developmentally delayed. Additionally, she learned from the nurse who had worked with A.V. that he was very malnourished when he first went into care. However, she saw significant improvement in A.V. during the time that she worked with him. In October of 2016 when he returned to his parents' care, A.V. was slightly delayed but, adjusting for his age and prematurity, "he looked really good." She did not think that further skilled therapy was needed. At that time, A.V. weighed eighteen pounds.

In November of 2017, when A.V. went into foster care for the second time, he weighed only sixteen pounds—two pounds less than he weighed when he left foster care a year before. He was placed with the physical therapist who had worked with him in 2016, and she became his foster mother. The foster mother testified that when she became his foster mother, A.V. was more than a year delayed, as he was at the level of a ten-month-old. She believed that, even given he was born prematurely, he should have weighed between twenty and twenty-five pounds. A.V. had very little muscle mass, was not walking, and was babbling and making sounds but not talking. Likewise, another Department social worker testified that when she first saw A.V. in November of 2017, he appeared to be the size and weight of a twelve-month-old, his overall development was that of an eleven or twelve-month-old, and he was not walking. She agreed that most children take their first step around one year old.

Father testified that he was aware that A.V. was malnourished and not developing as he should have been while he was in Father's care, and that he did not obtain services to help A.V. with walking and talking. However, Father did not realize that A.V. had lost weight when he came back into their care. One Department social worker testified that Father feels that it is his responsibility to work and provide financially for the family, and it is Mother's responsibility to

ensure the children are getting their medical and emotional needs met and to feed and care for them during the day. She further testified that she had talked with Father about his observing A.V. being underweight or not gaining weight, and Father said that he told Mother she needed to take care of it.

A Department social worker developed a case plan for Mother and for Father. Both parents were present at the case plan meeting in which the case plans were designed. One task on each parent's case plan was to attend as many of A.V.'s physical therapy, speech, and occupational therapy sessions as possible. The social worker testified that each parent attended only eleven out of forty scheduled speech and occupational therapy visits.

Regarding A.V.'s relationship with his parents and two sisters, the Department employee who supervised visits with A.V. testified that A.V. loves seeing his sisters, and that his sisters are very happy to see him. Similarly, the Department social worker testified that A.V. is close with his sisters; he engages with them and plays with them very well. She agreed that it is important to promote sibling relationships and that it would be in A.V.'s best interests to maintain a relationship with his sisters. Additionally, she had spoken at length about that with the foster mother, who was selected as a permanency plan placement, and the foster mother indicated that she would continue to encourage those relationships and A.V.'s relationships with his parents. The social worker further testified that A.V. loves his parents and goes to them and gets hugs from them, but in her opinion, his bond with them is more that of a child with an aunt or an uncle.

The magistrate court issued a memorandum decision and order, determining by clear and convincing evidence, that the Department had established statutory grounds for termination under Idaho Code section 16-2002(3)(b), neglect through failure to complete a case plan, and under section 16-1602(31), neglect through conduct or omission of the parents. The magistrate court also determined that termination was in A.V.'s best interests. A final judgment and a decree were entered, terminating both Mother's and Father's parental relationship with A.V. Father filed a timely notice of appeal.

## II. STANDARD OF REVIEW

Pursuant to Idaho Code section 16-2005(1), a court may terminate parental rights if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied. The trial court must find that grounds for terminating parental rights have been proved by clear and convincing evidence.

3

The clear and convincing evidentiary standard is met when there is evidence indicating that the thing to be proved is highly probable or reasonably certain.

On appeal, the appellate court does not reweigh the evidence to determine if it was clear and convincing. This Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court will indulge all reasonable inferences in support of the trial court's judgment.

*Matter of Doe II*, 165 Idaho 199, 202, 443 P.3d 213, 216 (2019) (citations and quotation marks omitted).

## III. ANALYSIS

### A. The magistrate court did not err in concluding that termination was in A.V.'s best interests, even though termination would result in the separation of A.V. from his siblings.

Many factors are to be considered when determining whether termination is in the best interests of the child. *Matter of Doe II*, 165 Idaho at 50, 443 P.3d at 218. In this case, the magistrate court weighed the factors identified by this Court in *Matter of Doe*, 165 Idaho 46, 52, 437 P.3d 922, 928 (2019), as well as several other factors that it determined to be relevant.

On appeal, Father's main argument is that termination was not in A.V.'s best interests because termination would result in A.V. being separated from his siblings. A child's relationship with his siblings is certainly a factor that the magistrate court may consider in its best interests analysis. As we stated in *Matter of Doe*, 164 Idaho 511, 516, 432 P.3d 60, 65 (2018), "The best interests analysis is an expansive analysis with 'no set list of factors a court must consider' . . . ." Additionally, it is undisputed that A.V. loves his sisters and that they enjoy spending time together. For example, one Department employee testified that A.V. loves seeing his sisters and they are really happy to see him. Likewise, a Department social worker agreed that it is important to foster sibling relationships and stated that A.V. is close with his sisters and engages with them very well.

The magistrate court considered A.V.'s relationships with his siblings in its best interests analysis. For example, it noted a Department social worker's testimony that in her opinion, it was in A.V.'s best interest to maintain his relationship with his siblings, a relationship "which she describe[d] as a close engaging relationship." The magistrate court also noted that she had testified that the foster mother had told her that "she was desirous of fostering a relationship

4

between A.V. and his siblings and also his parents were she to adopt A.V.," and the magistrate court commented, "[a]lthough this Court is certainly not indicating that such expressed desire would not be carried through by [the foster mother] the termination action against the parents leaves no legal way for them to require that such relationship be maintained."

However, although sibling relationships may be considered in the best interests analysis, it is only one factor in a multi-factor test, and Father does not argue that it is or should be determinative or given greater weight. *Cf., e.g.*, *Matter of Doe*, 164 Idaho at 516, 432 P.3d at 65 (stating that a parent's ability to change his or her conduct to assume parental responsibilities "is only one of many [factors] that goes into the best-interests analysis"). Here, the magistrate court considered A.V.'s bond with his sisters in its best interests analysis but nevertheless determined, by clear and convincing evidence, that termination was in A.V.'s best interests. Therefore, absent any argument or authority showing that the magistrate court gave insufficient weight to the sibling relationship factor, this Court will not second guess the magistrate court's balancing of the best interests analysis factors. *See In Interest of Doe Children*, 163 Idaho 367, 372, 413 P.3d 767, 772 (2018) ("Even in an appeal from the termination of parental rights, [the Court] will not consider an issue which was not supported by cogent argument and authority.") (citing *In re Doe*, 156 Idaho 103, 109, 320 P.3d 1262, 1268 (2014)).

**B. The magistrate court did not improperly consider the number of children that Mother and Father have as a factor in its analysis.**

Father also argues that the magistrate court erred because it improperly considered whether termination of parental rights to A.V. would enable Mother and Father to focus more on their other children. Father accurately cites *In re Doe*, 142 Idaho 594, 598, 130 P.3d 1132, 1136 (2006), for the proposition that this Court has not recognized the number of children in a family as a relevant factor in termination proceedings. However, the magistrate court did not use the number of Mother and Father's children as a factor in this case. The only portion of the magistrate court's analysis that could potentially be interpreted as doing so is where the magistrate court stated, "[Mother] candidly acknowledged frustration in the fact that, when she is with A.V., her daughter essentially butts in and demands attention from [Mother], which hampers her ability to care and nurture A.V." The magistrate court included this statement in a paragraph in which it discusses why the clear and convincing evidence standard had been met, and in particular, why it considered but decided against allowing Mother and Father "more time

5

to develop the skills necessary to appropriately parent A.V." Mother's acknowledgment about her frustration was one factor supporting the magistrate court's determination that allowing Mother and Father more time would "result in an unknown outcome." Therefore, the magistrate court did not use the number of Mother and Father's children as a factor in its analysis; instead, it considered Mother's own statements about her ability to handle competing demands from her children, which is relevant to the question of whether she would be likely to provide adequate care for A.V. in the future.

Additionally, Father, without citing any authority, argues that "it makes no logical sense" for a parent to be considered fit to raise two children but not a third. Relatedly, Father quotes the magistrate court's statement that "[o]ne of the most confusing parts about this case is that the Department is seeking to terminate the parental rights only as to A.V.," and not to his two sisters, who are Mother and Father's other children.

However, the standard for termination of parental rights is not parental fitness per se, but whether the evidence shows that one of the statutory grounds for termination has been met and that termination of parental rights would be in the child's best interests. *See* I.C. § 16-2005(1). This statute allows for termination of parental rights not only when a parent is unable to provide a minimum level of care (*see, e.g.*, section 16-2005(1)(d)), but also when a parent is able to provide a minimum level of care but, for whatever reason, fails to do so (*see, e.g.*, section 16-2005(1)(b)).

The magistrate court recognized that "engaging in a comparison of who can provide better [care] is certainly not the standard by which courts must determine termination cases," and that "a parent's interest in maintaining a relationship with his or her child is a fundamental interest protected by the Fourteenth Amendment of the United States Constitution." The magistrate court balanced these considerations with the evidence showing the neglect that this particular child had suffered. It also found that, despite the many months given to complete their case plans, both parents were noncompliant with the case plan task that required them to understand their role in the circumstances that brought A.V. into care.

Therefore, it is not illogical for a court to terminate parental rights to only one child, even though the child has one or more siblings, when, as here, the evidence shows that the parents have neglected that child and that termination of parental rights is in his best interests. While it may be rare for a parent's rights to be terminated as to some children but not others, this Court

has upheld termination under those circumstances in at least one case. *See Dep't of Health & Welfare v. Doe*, 147 Idaho 353, 354, 209 P.3d 650, 651 (2009). Father has not shown that it was error for the magistrate court to terminate parental rights to A.V. while parental rights to his other two children remained intact.

**C. The magistrate court did not err in finding that Father was also responsible for A.V.'s neglect, even though it was Mother's act of leaving A.V. alone that caused A.V. to go into care.**

Finally, Father argues that the magistrate court erred because it was Mother's fault that A.V. came into IDHW's care, not Father's. This argument fails because it is irrelevant. Although it is undisputed that Mother's act of leaving A.V. in the apartment alone was the reason that A.V. came into care, the magistrate court determined that both Mother and Father were responsible for the *prior* neglect of A.V. that was uncovered as a result of A.V.'s coming into care—the neglect that led to A.V.'s developmental delays. Specifically, the magistrate court stated, "As ironic as it may seem, it perhaps was a good thing that A.V. was put into care the second time because it is clear that neither [Mother] nor [Father] recognized the malnourishment and not only were they unable to stimulate the child in meeting milestones but i[t] appears that their actions or most likely total inaction initiated significant regression in age levels through the child protection case following the discovery of A.V. alone in the apartment."

Father does not argue that he was not responsible for parenting A.V. from October of 2016 to November of 2017, the period when A.V. lost weight and his developmental delays worsened. The magistrate court specifically found that both Mother and Father were responsible for A.V. during this time: "The evidence demonstrates that only [Mother] and [Father] had the care of A.V. during this approximate 13 month period and while the specifics are unknown the ultimate results of weight loss and regression can only be attributed to [Mother] and [Father]." Father, likewise, testified that during that time, he did not realize A.V. had lost weight but was aware that A.V. was not walking, speaking, or developing as he should have been and nevertheless did not obtain services to help A.V. with those problems. Similarly, a Department social worker testified that when she spoke to Father about whether he observed that A.V. was underweight or not gaining weight, Father said that he would tell Mother that she needed to take care of it.

Relatedly, the magistrate court expressed its concern that Father did not recognize A.V.'s malnutrition and developmental delays during the twelve-month period between A.V.'s first and

second placements in foster care. It concluded that the evidence clearly established that Mother and Father "were simply unable to recognize the dangers" and obtain the care needed to alleviate those dangers. Its concern, it added, was supported by the testimony of Mother and Father themselves. Conversely, the magistrate court noted that A.V. made significant progress in foster care. For example, his weight increased to a normal level and he showed substantial improvement in his gross motor skills. Therefore, the magistrate court did not err in concluding that Father was also responsible for A.V.'s neglect, even though it was Mother's actions that led to A.V. being placed in foster care.

## IV.    CONCLUSION

In light of the foregoing, the decree of the magistrate court is affirmed.


Chief Justice BURDICK, and Justices BEVAN, STEGNER, and MOELLER CONCUR.