IN THE SUPREME COURT OF THE STATE OF IDAHO

**Docket No. 47190**

| | |
|---|---|
| In the Matter of: John Doe I,<br>A Child Under Eighteen (18) Years of Age.<br>------------------------------------------------------------<br>STATE OF IDAHO, DEPARTMENT OF<br>HEALTH AND WELFARE,<br><br>   Petitioner-Respondent,<br><br>v.<br><br>JANE DOE (2019-18),<br><br>   Respondent-Appellant. | Boise, November 2019 Term<br><br>Opinion Filed: December 23, 2019<br><br>Karel A. Lehrman, Clerk |

Appeal from the Magistrate Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Thomas H. Borresen, Magistrate Judge and Calvin H. Campbell, Magistrate Judge.

Decree terminating parental rights is <u>affirmed</u>.

Marilyn Paul, Twin Falls Public Defender, Twin Falls, for appellant.

Lawrence G. Wasden, Idaho Attorney General, Twin Falls, for respondent.

---

BRODY, Justice.

Jane Doe ("Mother") appeals from the magistrate court's judgment granting the Idaho Department of Health and Welfare's ("the Department") petition to terminate her parental rights to her son, A.V. The magistrate court concluded that the Department proved by clear and convincing evidence that Mother and John Doe ("Father") neglected A.V. and that termination was in A.V.'s best interests. Father's termination is the subject of a separate appeal (Dkt. No. 47200). Mother's main argument on appeal is that the magistrate court erred in terminating her parental rights because her disabilities prevented her from completing her case plan. We affirm the magistrate court's decree terminating Mother's parental rights.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A.V., the child at issue in this case, went into foster care in November 2017, when he was approximately two-and-a-half years old. Mother acknowledged that A.V. went into care after she

1

had left him alone in an apartment. One Department social worker testified that he met with Mother a few days later and talked with her about the fact that A.V. was malnourished. He testified that Mother indicated A.V. previously had a hiatal hernia and that he was always going to have a problem gaining weight. However, after a Department investigation, and having A.V. examined by doctors, that did not turn out to be the case.

A.V. had been in shelter care once before from the time he was ten months old until he was about eighteen-months old. While in care, A.V. received physical therapy from a board-certified pediatric physical therapist. She worked with A.V. from July 2016, until he was returned to his parents in October of 2016. She testified that when she first began working with A.V., he was approximately four to six months developmentally delayed. Additionally, she learned from the nurse who had worked with A.V. that he was very malnourished when he first went into care. However, she saw significant improvement in A.V. during the time that she worked with him. In October of 2016, when he returned to his parents' care, A.V. was slightly delayed but, adjusting for his age and prematurity, "he looked really good." She did not think that further skilled therapy was needed. At that time, A.V. weighed eighteen pounds.

In November of 2017, when A.V. went into care for the second time, he weighed only sixteen pounds—two pounds less than he weighed when he left foster care a year before. He was placed with the physical therapist who had worked with him in 2016, and she became his foster mother. The foster mother testified that when she became his foster mother, A.V. was more than a year delayed, as he was at the level of a ten-month-old. She believed that, even given that A.V. was born prematurely, he should have weighed between twenty and twenty-five pounds. A.V. had very little muscle mass, was not walking, and was babbling and making sounds but not talking. Likewise, another Department social worker testified that when she first saw A.V. in November of 2017, he appeared to be the size and weight of a twelve-month-old, his overall development was that of an eleven or twelve-month-old, and he was not walking. She agreed that most children take their first step around one year old.

In response to a question about why she thought A.V. was losing weight in the time period before he was placed into care in November of 2017, Mother testified that she was dealing with a very big loss—the death of her mother by suicide—and unfortunately she let it get in the way of her life and the lives of her children. She did not ask for help because she did not

want people feeling sorry for her. However, after A.V. was placed in foster care, she realized that all of this could have been avoided if she had just reached out for help.

A Department social worker developed a case plan for Mother and Father. Both parents were present at the case plan meeting in which the case plans were designed. One task on each parent's case plan was to attend as many of A.V.'s physical therapy, speech, and occupational therapy sessions as possible. The social worker testified that each parent attended only eleven out of forty scheduled speech and occupational therapy visits.

Another task on each parent's case plan was to complete a parenting class. The Department social worker testified that neither parent completed this task. The leader of the parenting class, which was known as Nurturing Parents, testified that neither parent turned in their homework, and neither showed for the final in-home session. She explained that the homework is a required part of the class because it helps parents apply what they have learned to their own households. She testified that throughout the class, she reminds parents that if they turn in the homework and attend all of the sessions, they pass, but if they do not, they fail.

The parenting class teacher further testified that she repeatedly had to ask Mother to put her phone away during the class. She was not aware of Mother's ADHD. However, all parents do a self-evaluation at the end of every class to tell her how well they understand the curriculum, and Mother repeatedly remarked that she understood the curriculum very well. Furthermore, the parents had eighteen weeks to complete their homework; they were not required to turn it in each week. The Department social worker testified that she did not know that Mother had ADHD or other learning problems because Mother did not make her aware of them. She also testified that Mother is now attending Parents as Teachers, another parenting class, and that Mother told her that it took her a while to get into the class because she had to be on a waiting list. She testified that Parents as Teachers is a one-on-one program, and agreed that it might be more effective for Mother.

Mother testified that as a child, she was diagnosed with dyslexia and was often distracted in school. She was in special education and did not graduate from high school. She was distracted most of the time during the parenting class, and distracted when she tried to complete the homework. She testified that Nurturing Parents was not the most effective way for her to learn, but the Parents as Teachers class, which she began in January and was still ongoing, had been much more effective. Mother explained that Parents as Teachers is very hands-on and

3

involves working with everyone in the home. Mother testified that she believed that what she was learning in this class would be helpful in her parenting of A.V., and that she had asked Parents as Teachers for advice on how to parent A.V. during his visits with her. She agreed that she did not do that well in Nurturing Parents, but was doing things to make up for it now. She testified that she could have started Parents as Teachers earlier if she had known about the program, but she did not find out about this class until November or December. She knew she needed a parenting class but did not know exactly where to look for it, and she had asked her social worker about this.

One of Mother's tasks required her to complete a psychiatric evaluation and follow all recommendations. The Department social worker testified that Mother completed the evaluation but did not follow up on the recommendation for counseling, having only attended one or two counseling sessions. Mother acknowledged that she had not followed up with counseling, but testified that she had set up an appointment to discuss starting therapy sessions again.

Mother testified she felt that it would be in A.V.'s best interests to be returned to her; she acknowledged that she had made serious mistakes, but argued that she had improved. She testified that she clearly understands A.V.'s needs, such as going to the doctor and having a good diet, and she is now receiving help and wants to receive help. The Department social worker testified, regarding the parents' progress, "I think that the parents are making progress in regards to the other two children in their home and they are showing they can provide for their needs, but I don't feel that they have made enough progress, given the amount of time and the amount of services that were provided to them, to show that they will continue to meet [A.V.]'s needs."

Regarding A.V.'s relationship with his parents and two sisters, the Department employee who supervised Mother's visits with A.V. testified that A.V. loves seeing his sisters, and that his sisters are very happy to see him. Similarly, the Department social worker testified that A.V. is close with his sisters; he engages with them and plays with them very well. She agreed that it is important to promote sibling relationships and that it would be in A.V.'s best interests to maintain a relationship with his sisters. Additionally, she had spoken at length about that with the foster mother, who was selected as a permanency plan placement, and the foster mother indicated that she would continue to encourage A.V.'s relationships with his parents and sisters. She further testified that A.V. loves his parents and goes to them and gets hugs from them, but in her opinion, his bond with them is more that of a child with an aunt or an uncle.

4

The magistrate court issued a memorandum decision and order, determining by clear and convincing evidence, that the Department had established statutory grounds for termination under Idaho Code section 16-2002(3)(b), neglect through failure to complete a case plan, and under section 16-1602(31), neglect through conduct or omission of the parents. The magistrate court also determined that termination was in A.V.'s best interests. A final judgment and a decree were entered, terminating both Mother's and Father's parental relationship with A.V. Mother filed a timely notice of appeal.

## II. ISSUES PRESENTED

A. Whether the magistrate court erred in determining that Mother neglected A.V.

B. Whether the magistrate court erred in determining that termination of Mother's parental rights was in A.V.'s best interests.

## III. STANDARD OF REVIEW

Pursuant to Idaho Code section 16-2005(1), a court may terminate parental rights if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied. The trial court must find that grounds for terminating parental rights have been proved by clear and convincing evidence. The clear and convincing evidentiary standard is met when there is evidence indicating that the thing to be proved is highly probable or reasonably certain.

On appeal, the appellate court does not reweigh the evidence to determine if it was clear and convincing. This Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court will indulge all reasonable inferences in support of the trial court's judgment.

*Matter of Doe II*, 165 Idaho 199, 202, 443 P.3d 213, 216 (2019) (citations and quotation marks omitted).

## IV. ANALYSIS

### A. The magistrate court did not err in determining that Mother neglected A.V.

One of the five grounds for termination of parental rights in Idaho Code section 16-2005(1) is neglect. I.C. § 16-2005(1)(b). The Idaho Code "defines several bases for neglect." *Matter of Doe*, 165 Idaho 46, 50, 437 P.3d 922, 926 (2019). One basis for neglect arises when:

The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

(i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and

5

(ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

*Id.*; Idaho Code § 16-2002(3)(b). Another basis for neglect occurs when a child "is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . ." Idaho Code §§ 16-2002(3)(a), 16-1602(31)(a); *Matter of Doe*, 165 Idaho at 50, 437 P.3d at 926. The satisfaction of either basis for neglect is sufficient to support termination of parental rights. *See Matter of Doe I*, 164 Idaho 849, 853, 436 P.3d 670, 674 (2019) (stating that "only one definition of neglect needs to be satisfied").

In this case, the magistrate court concluded that Mother had neglected A.V. under both of these bases. On appeal, Mother makes several statements regarding her disabilities and argues that the magistrate court erred in concluding that she had neglected A.V. However, Mother does not make clear exactly how her disabilities relate to any alleged error by the magistrate court.

At best, a few sentences in Mother's opening brief seem to challenge the magistrate court's finding of neglect based on her "conduct or omission" under Idaho Code section 16-1602(31). Mother states:

> In this case Mother has acknowledged that she left the child unattended and that she should not have done this. She did so at least in part because of her mental disabilities. She testified that she had been overwhelmed because she was suffering from anxiety and depression which was made worse by her mother's suicide.

First, the magistrate court did not find neglect based on Mother's decision to leave A.V. alone in the apartment. Instead, it found neglect "based upon the delays shown in A.V. and his malnourishment" that occurred between his first and second placements in foster care. Second, Mother presents no authority or argument in support of the proposition that a parent's "mental disabilities" provide a defense against this basis for neglect, and she does not dispute that her conduct or omission in this case constituted neglect. *See In Interest of Doe Children*, 163 Idaho 367, 372, 413 P.3d 767, 772 (2018) ("Even in an appeal from the termination of parental rights, [the Court] will not consider an issue which was not supported by cogent argument and authority.") (citing *In re Doe*, 156 Idaho 103, 109, 320 P.3d 1262, 1268 (2014)). Mother makes the broad statement that "[t]he child welfare system must comply with [the] ADA as well as Section 504 of the Rehabilitation Act as long as it receives federal funding. Agencies may not discriminate on the basis of disability and must provide reasonable accommodations to appropriately serve parents with disabilities." Mother fails to articulate any basis explaining how

6

the magistrate court's decision in this case runs afoul of those requirements, and simply citing authority without linking it to the case at hand is not enough. It is not the Court's job to construct Mother's arguments for her. Our standard of review requires that a cogent argument be presented. Therefore, Mother's argument regarding this basis for neglect is unavailing.

Additionally, substantial and competent evidence supports the magistrate court's conclusion that the basis for neglect had been established "based upon the delays shown in A.V. and his malnourishment." A.V. lost two pounds between October of 2016, when he was returned to Mother and Father after his first placement in foster care, and November of 2017, when he was placed into foster care for the second time. The foster mother testified that when he went into care the second time, A.V. was more than a year delayed, had very little muscle mass, and was not walking or talking. Similarly, a Department social worker testified that A.V. appeared to be the size and weight of a twelve-month-old and his overall development was that of an eleven or twelve-month-old, at a time when A.V. was approximately two-and-a-half years old. Another Department social worker testified that after investigation, it was determined that A.V.'s previous hernia was not the cause of his malnourishment in November of 2017. Therefore, substantial evidence supports the magistrate court's determination that A.V. had been neglected by his parents through their "conduct or omission" under section 16-1602(31).

Finally, Mother seems to argue that her disabilities should excuse her failure to comply with her case plan—a basis for neglect under Idaho Code section 16-2002(3)(b). However, as explained above, this basis for neglect is independent of the basis for neglect through a parent's "conduct or omission" under section 16-1602(31). Because the magistrate court's conclusion regarding neglect under section 16-1602(31) is supported by substantial and competent evidence, we do not reach the merits of Mother's argument.

## B. The magistrate court did not err in determining that termination was in A.V.'s best interests.

Many factors are to be considered when determining whether termination is in the best interests of the child. *Matter of Doe II*, 165 Idaho at 204, 443 P.3d at 218. In this case, the magistrate court weighed the factors identified by this Court in *Matter of Doe*, 165 Idaho at 52, 437 P.3d at 928, as well as several other factors that it determined to be relevant.

On appeal, Mother argues that it was not in A.V.'s best interests to terminate her parental rights because A.V. "has a positive relationship with both of his parents and his two sisters," noting that "[e]ven the foster mother acknowledges that it is in AV's best interest to maintain

contact with both his siblings and his parents." Mother states that "Idaho Code [section] 32-717[1](c) includes 'the interaction and interrelationship of the child with his or her parent or parents, and his or her siblings;' as factors to be considered in determining the best interest of a child." However, this statute concerns child custody in divorce proceedings, not termination of parental rights proceedings. *See* I.C. § 32-717. Nevertheless, a child's relationship with his parents and siblings is certainly a factor that the magistrate court may consider when determining the best interests of a child in a termination proceeding. *See Matter of Doe*, 164 Idaho 511, 516, 432 P.3d 60, 65 (2018) ("The best interests analysis is an expansive analysis with 'no set list of factors a court must consider' . . . ."). Additionally, it is undisputed that A.V. loves his sisters and that they enjoy spending time together. For example, the Department employee who supervised Mother's visits with A.V. testified that A.V. loves seeing his sisters and they are really happy to see him. Likewise, a Department social worker agreed that it is important to promote sibling relationships and stated that A.V. is close with his sisters and engages with them very well. The record also shows a bond between A.V. and his parents. For example, the Department social worker testified that A.V. loves his parents and gets hugs from them, though in her opinion his relationship with them is more that of a child with an aunt or uncle.

However, a child's relationship with his parents and siblings is only one factor in a multi-factor test, and Mother does not argue that it is or should be determinative or given greater weight. *Cf., e.g.*, *id.* (stating that a parent's ability to change his or her conduct to assume parental responsibilities "is only one of many [factors] that goes into the best-interests analysis"). Here, the magistrate court clearly considered A.V.'s bond with his sisters in its best interests analysis. For example, it stated that "[i]t has long been recognized that maintaining sibling relationship[s] is typically in the best interest of the children" and noted that, although a Department social worker indicated that the foster mother expressed a desire to foster A.V.'s relationship with his siblings, "the termination action against the parents leaves no legal way for them to require that such relationship be maintained." Though the magistrate court did not consider A.V.'s bond with Mother and Father as an independent factor in its best interests analysis, it did note a Department social worker's testimony that A.V. goes to his parents for hugs but she views his relationship between him and his parents as similar to a relationship with an aunt or uncle. After balancing this consideration and all factors that it found to be relevant, the magistrate court determined, by clear and convincing evidence, that termination was in A.V.'s

best interests. Therefore, without argument or authority showing that the magistrate court gave insufficient weight to A.V.'s relationship with his parents or siblings, this Court will not re-weigh the magistrate court's balancing of the best interests analysis factors. *See In Interest of Doe Children*, 163 Idaho at 372, 413 P.3d at 772 ("Even in an appeal from the termination of parental rights, [the Court] will not consider an issue which was not supported by cogent argument and authority."); *see also id.* at 377, 413 P.3d at 777 (holding that a mother's claim that terminating her parental rights would be "devastating" to the child because of the child's strong bond with her "[did] not override facts demonstrating termination was in the best interests of the child").

Mother also argues that her parenting skills and relationship with A.V. will improve given that she is now in parenting programs that better accommodate her learning disabilities, and that she did not find out about these programs until December of 2018. Again, however, Mother provides no argument or authority showing why this consideration should have outweighed others in the magistrate court's best interests analysis. *See Matter of Doe*, 164 Idaho at 516, 432 P.3d at 65 ("This Court has held on prior occasions that the lower court did not err by finding that a parent's recent improvement is outweighed by the other factors of the best interests analysis."). Additionally, the magistrate court recognized that Mother had made progress in her parenting skills in the few months before trial, but also expressed its concern that Mother did not recognize A.V.'s malnutrition and developmental delays during the twelve-month period between his first and second placements in foster care. It concluded that the evidence clearly established that she and Father "were simply unable to recognize the dangers" and obtain the care needed to alleviate those dangers. Its concern, it added, was supported by the testimony of Mother and Father themselves. Conversely, the magistrate court noted that A.V. made significant progress in foster care. For example, his weight increased to a normal level and he showed substantial improvement in his gross motor skills. Therefore, the magistrate court did not err in concluding that termination of Mother's parental rights was in A.V.'s best interests.

## V. CONCLUSION

In light of the foregoing, the decree of the magistrate court is affirmed.


Chief Justice BURDICK, and Justices BEVAN, STEGNER, and MOELLER CONCUR.